## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**UNITED STATES OF AMERICA**

        **Plaintiff,**

**vs.**                      **CASE NO.: 3:06cr447/MCR**

**SYLVESTER WRIGHT,**

        **Defendant.**

_____/

## ORDER GRANTING MOTION TO SUPPRESS

Defendant Sylvester Wright ("Wright) is charged in a one-count indictment dated October 17, 2006, with possession of a controlled substance with intent to distribute,  in violation of Title 21 U.S.C. § 841.  Pending is Wright's motion to suppress statements as well as evidence seized from his person and the automobile he was driving at the time of his arrest. The government filed a response to the motion, and the court conducted a hearing on November 21, 2006, at which it took evidence and heard oral argument. As explained below, the court GRANTS Wright's motion.

**Findings of Fact**

Based on evidence presented at the hearing, the court makes the following findings of fact.   On September 13, 2006, at approximately 2:00 a.m., Wright was driving southbound on Davis Highway in Pensacola, Florida, with a female passenger, Alicia Key ("Key").   The vehicle in which Wright and Key were traveling, a borrowed 2007 Monte Carlo, had a temporary tag taped to the inside of the rear windshield.   At the same time that Wright and Key were headed southbound on Davis Highway, Pensacola Police Department Officer Matthew Coverdale ("Coverdale") was driving northbound on Davis

Highway.[1]  As the two vehicles passed, Coverdale looked in his rear view mirror but could not see any tag displayed on the Monte Carlo.  Accordingly, Coverdale made a U-turn in order to follow Wright's vehicle and investigate; he did not activate his siren or lights. Taking the same path as Wright, although occasionally losing sight of Wright's vehicle, Coverdale turned east on Royce Street, towards the Maison DeVille apartment complex. Shortly thereafter Coverdale arrived at the apartment complex, where he spotted the parked Monte Carlo with its brakes lights still visible.  Coverdale drove towards the Monte Carlo, then parked his cruiser at an angle to Wright's vehicle.  The cruiser was situated approximately twenty feet from the driver's side rear bumper, with its headlights still illuminated.[2]  Wright and Key remained seated in the vehicle.  Immediately prior to stepping out of the cruiser in order to approach the Monte Carlo, Coverdale activated his cruiser's "two beam" spot light.  At this time Coverdale saw a "white rectangular piece of paper" on the Monte Carlo's rear windshield which he assumed was a temporary tag but was unable to read. Coverdale exited his cruiser and started to walk towards the Monte Carlo.  When Coverdale was within approximately four feet of the rear of the Monte Carlo, he observed Wright open the driver's door and begin to step out of the vehicle.[3]  As Wright started to exit his car Coverdale immediately stated to Wright words to the effect, "do me a favor and stay in the vehicle for me."[4]  Wright complied immediately.  Coverdale then approached

---

[1]  Coverdale was not riding with another officer that evening although he was accompanied by a civilian guest .

[2]  Coverdale testified that his cruiser was parked approximately twenty feet from the Monte Carlo, leaving adequate room for Wright to move his vehicle had he wished to do so.  According to the hearing testimony of Ms. Key, however, the distance between the two vehicles was no more than ten feet and the Monte Carlo was prevented from moving due to the position of cruiser and some nearby trees.  For the purpose of the instant order, the court accepts Coverdale's testimony that the distance between the vehicles was approximately twenty feet.

[3]  By then approximately fifteen to twenty seconds had elapsed after the time Coverdale pulled into the parking lot and stopped near the Monte Carlo.

[4]  At the time Coverdale arrived at the apartment complex he had not determined whether the Monte Carlo contained any passengers.  At some point after approaching the vehicle, however, Coverdale became aware of Key's presence and also directed her to remain in the vehicle.

Wright and either asked him if he had a driver's license or indicated that he should produce one.  Wright informed him that his license had been suspended, at which point Coverdale directed Wright to get out of the car.[5]  Based on Wright's acknowledgment of driving without a valid license, Coverdale arrested Wright, then handcuffed and searched him. Coverdale also ran a NCIC/FCIC search, which confirmed that Wright's license had been suspended and disclosed that Wright had a warrant outstanding against him. After securing Wright, Coverdale inspected the temporary tag, which was obscured by condensation on the window's exterior.  After Coverdale removed the condensation by wiping the windshield with his hand, he determined that the tag was valid, i.e., it contained the appropriate description of the Monte Carlo and it was not expired.  In the course of a search of Wright's vehicle incident to the arrest, cocaine and cocaine base were discovered in a shoe box in the back seat.[6]  Wright also made incriminating statements to the officers at the scene and later at the jail.  Coverdale cited Wright for possessing an open container of alcohol, having no visible tag, and driving with a suspended license (habitual).

**Discussion**

Wright contends that Coverdale unlawfully detained him.  According to Wright, Coverdale did determine or should have been able to determine that the temporary tag was properly displayed on the Monte Carlo when he pulled up behind the vehicle at the apartment complex. And, once Coverdale observed the valid temporary tag, he had no other lawful basis to detain Wright or to request his driver's license. Wright therefore argues that his detention was unlawful and that, consequently, the search of his vehicle incident to his arrest was likewise unlawful.  Thus, Wright submits, the contraband found

---

[5]  As Wright complied, Coverdale noticed a small bottle of cognac and a cup of what appeared to be an alcoholic beverage in the vehicle to the right of where Wright had been seated.

[6] At some point after Wright was removed from the vehicle, Key was permitted to exit it as well. She was later searched by a female officer who arrived on the scene and eventually released, upon the determination that she was not responsible for the contraband found in the Monte Carlo.

during the search of the Monte Carlo and his statements to law enforcement must be suppressed.  The government responds that the interaction between Wright and Coverdale amounted to nothing more than a consensual encounter and thus the Fourth Amendment is not implicated, much less violated.

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.   Not all interactions between law enforcement and citizens, however, implicate the scrutiny of the Fourth Amendment.  The Eleventh Circuit has noted that there are three types of encounters between police and citizens with varying levels of Fourth Amendment scrutiny: "(1) police-citizen involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests."  United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006) (citing United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989)).

The first type of encounter, often referred to as a consensual encounter, does not implicate the Fourth Amendment.  Id. (quoting United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986)).   The test of whether a consensual encounter has occurred is "whether a reasonable person would have felt free to terminate the encounter."  Perez, 443 F.3d at 777-778 (quoting United States v. Drayton, 536 U.S. 194, 200-201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002)).  Thus, the Supreme Court has held that  police officers, without any level of suspicion of criminal activity, can "pose questions, ask for identification, and request consent to search luggage."  Id. (quoting Drayton, 536 U.S. at 200-201).  If the citizen's cooperation is induced by "coercive means" or if a reasonable person would not "feel free to terminate the encounter," however, then the encounter is no longer consensual, a seizure has occurred, and the citizen's Fourth Amendment rights are implicated.  Id. at 777-778; see also Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (indicating that Fourth Amendment safeguards are implicated where there is a show of official authority such that a reasonable person would believe he was not free to leave).   With respect to the second type of encounter, brief

seizures or investigatory detentions, the Fourth Amendment does not prohibit law enforcement officers "in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880 (1968). That is, law enforcement officers may seize a suspect for a brief, investigatory Terry-stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop "was reasonably related in  scope to the circumstances which justified the interference in the first place." Id. at 20; United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004). Reasonable suspicion requires only a fair probability that illegal activity has occurred. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585 (1989). A court reviewing the reasonableness of the officers' suspicion must consider the totality of the circumstances leading up to the stop. See Acosta, 363 F.3d at 1145.  A traffic stop "may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity." United States v. Boyce, 351 F.3d 1102 (11th Cir. 2003) (quoting United States v. Purcell, 236 F.3d 1274, 1277 (11th  Cir. 2001)) (citations omitted in original).  "The government bears the burden of proving voluntary consent based on the totality of the circumstances."  United States v. Gregoire, 425 F.3d 872, 875 (10th Cir. 2005). The government also bears the burden of establishing "that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (stating that once a defendant has challenged the legality of a warrantless search and seizure, the burden is on the government to demonstrate that law enforcement did not violate the defendant's constitutional rights). The applicable burden of proof for a suppression motion is a preponderance of evidence. United States v. Matlock, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).  In addition, "[t]he court is charged with reviewing the credibility of the witnesses and the weight to be given

the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." <u>United States v. McKneely</u>, 6 F.3d 1447, 1453 (10th Cir. 1993) (citations and internal quotation marks omitted).

As a threshold matter, the court is unpersuaded by the government's contention that the interaction between Coverdale and Wright constituted only a consensual encounter. It is true that Coverdale did not initiate a traffic stop or pull Wright's vehicle over but rather simply approached Wright and Key as they sat in the parked car.  In addition, Coverdale did not activate his siren or blue lights prior to approaching the vehicle, display his weapon, or use his vehicle to block the path of the Monte Carlo.  Nevertheless, the court concludes that considering the totality of circumstances present on the evening in question, in making contact with Wright Coverdale exhibited a show of authority sufficient to make a reasonable person conclude that he was not free to leave.

First, while Coverdale may have stopped his marked patrol car as far as twenty feet away from the Monte Carlo, parking the cruiser at an angle to Wright's vehicle with the headlights still illuminated and directed at the Monte Carlo – rather than simply pulling into a parking place and extinguishing the lights – was a show of authority over the Monte Carlo's occupants, even if a moderate one.  In addition, however, almost simultaneously Coverdale brightly illuminated the Monte Carlo with his cruiser's high intensity spot light. Taken together, these actions constituted a show of authority which would have been intimidating, at least to a degree, to a reasonable person.  Furthermore, especially given that Wright was in the process of exiting the Monte Carlo under these conditions when Coverdale first spoke to him, a reasonable person would have felt compelled to comply with the directive to remain seated, even if Coverdale's precise words and tone of voice were not overtly coercive.[7]  The belief that Wright was not free to leave would have been reinforced when, despite Wright's immediate compliance with the directive to remain in the vehicle, Coverdale (who was wearing official attire which clearly identified him as a law

_____

[7]  At the very least Coverdale's statement to Wright regarding remaining in the vehicle should be construed as a directive, notwithstanding his possible inclusion of the phrase "do me a favor."

enforcement officer) proceeded directly to the driver's door and began questioning Wright about his driver's license.  Moreover, Coverdale testified that he preferred that Wright remain in the vehicle for officer safety reasons because "if he's in the vehicle, he's somewhat contained."[8]  The evidence thus reflects that Coverdale intended to convey to Wright that his freedom of movement was restricted –  and in effect he did convey that instruction.  In short, considering the totality of the circumstances present on the evening in question, the court concludes that Coverdale exhibited a "show of authority" sufficient to make a reasonable person believe that he was not free to terminate the encounter.  Therefore, the court finds that the encounter between Coverdale and Wright was not consensual in nature but rather amounted to an investigatory detention.

The government has not argued, either in its written response or at the hearing, that Coverdale's encounter with Wright constituted a permissible <u>Terry</u>-stop.  Nonetheless, the court briefly addresses the reasons for its conclusions that while Coverdale's detention of Wright initially was constitutionally permissible his continued detention of him was not.

Coverdale's decision to approach Wright in the Maison DeVille parking lot did not violate the Fourth Amendment because Coverdale reasonably formed the suspicion that the Monte Carlo did not have a license tag when he briefly passed Wright's vehicle on Davis Highway and did not see a tag. "Certainly, a vehicle's apparent failure to display some sort of visible license plate/registration tag, temporary or permanent, gives rise to a reasonable suspicion that its driver might be violating any one of the multitude of applicable traffic and equipment" regulations.  <u>United States v. Holt</u>, 264 F.3d 1215, 1220 (10th Cir. 2001) (<u>en</u> <u>banc</u>); <u>see</u> <u>also</u> <u>Jenkins</u>, 452 F.3d 207, 212 (2d Cir. 2006) (holding that a mistake of fact concerning the basis for a traffic stop did not invalidate it as long as the

---

[8] The government cites several Eleventh Circuit cases in support of its contention that a police officer can have a consensual encounter with the occupants of a parked car, including <u>Wright v. Harget</u>, 458 F.3d 1251 (11th Cir. 2006), and <u>United States v. De La Rosa</u>, 922 F.2d 675 (11th Cir. 1991).  In neither of these cases, however, did the police officer direct the occupants of the car to either exit the car or stay in the car during the duration of the consensual encounter. Accordingly, <u>Harget</u> and <u>De La Rosa</u> are both factually distinguishable from the instant case, as neither case involves an officer's restricting a person's freedom of movement.

officer had reasonable suspicion that a traffic violation was occurring) (citing and quoting Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) and Illinois v. Rodriguez, 497 U.S. 177, 185-186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).

Notwithstanding the court's determination that the Fourth Amendment was not offended by Coverdale's initial stop of Wright it nevertheless concludes that Coverdale engaged in conduct immediately following the stop which did violate Wright's Fourth Amendment rights.  Once Coverdale observed what he assumed was a temporary tag – and which in fact was, from all appearances, a valid temporary tag – "attached to the inside of the rear window in an upright position so as to be clearly visible from the rear of the vehicle," § 320.131(4), Fla. Stat. (2000), his initial suspicion and basis for the Terry-stop dissipated and he no longer had any reasonable suspicion to detain Wright or to request his driver's license. See United States v. Edgerton, 438 F.3d 1043 (10th Cir. 2006) (holding that although officer had reasonable suspicion sufficient for initial detention based on inability to read temporary tag, once officer was able to read the tag any suspicion of violation of tag statute dissipated; defendant's detention thereafter violated the Fourth Amendment); United States v. McSwain, 29 F.3d 558 (10th Cir. 1994) (finding that detention to question defendant after stop based on officer's initial concerns about validity of temporary tag – which concerns dissipated after closer inspection of tag –  exceeded the scope of the stop's underlying justification); State v. Diaz, 850 So.2d 435 (Fla. 2003) (holding that motion to suppress was properly granted because, although officer initially was unable to read temporary tag, he able to view it and assess its validity before requesting defendant's license and registration; accordingly, detention after determining validity of tag violated defendant's Fourth Amendment rights).

The evidence reflects that Coverdale issued a citation to Wright for having "no visible tag" on the Monte Carlo he was driving.  If the Monte Carlo indeed was in violation of § 320.131(4), a continuing traffic violation would have occurred, and Coverdale's request for Wright's license would have been justified.  See, e.g., United States v. Ledesma, 447 F.3d 1307, 1313 (10th Cir. 2006); United States v. Dumas, 94 F.3d 286 (7th Cir. 1996);

United States v. Degasso, 369 F.3d 1139 (10th Cir. 2004); United States v. Zucco, 71 F.3d 188, 191 n.10 (5th Cir. 1995).  The court is of the opinion, however, that no such violation occurred.  As noted above, in relevant part § 320.131(4) requires that "[t]emporary tags shall be . . . attached to the inside of the rear window in an upright position so as to be clearly visible from the rear of the vehicle."  The court reads this language as relating to the visibility of the temporary tag with respect to how it is "attached" to the inside of the rear window.  More specifically, § 320.131(4) requires only that a temporary tag be attached so as to be "clearly visible"; no other factors which may be relevant to validity are addressed in § 320.131(4).  In this case, the evidence of record indicates that the temporary tag was properly attached to the inside of the rear window without obstruction and thus was "clearly visible," as required by the statute.

Moreover, in numerous cases which address the visibility of temporary tags, violations were found only when the tag was affixed in such a way as to obscure visibility.  For example, in Ledesma and Dumas findings of a continuing violation were upheld because the vehicle's rear window was tinted so that the temporary tag was not clearly visible.  Ledesma, 447 F.3d at 1313; Dumas, 94 F.3d at 290.  Further, in Edgerton, the Tenth Circuit concluded that a Kansas statute requiring that temporary tags be "clearly visible" was not violated simply because the evening darkness made the tag difficult to read.  "Simply put, the tag was illegible not due to any material within Defendant's ability to control, but due to external conditions."  Edgerton, 438 F.3d at 1050. The court went on to state that

> Under the Government's interpretation of Sec. 8-133 [Kansas' statute that applies to both temporary tags and permanent license plates], snow, rain, fog, glare, or even an officer's poor eyesight might render a temporary registration illegibile and in violation of the statute. Anyone driving under less than optimal viewing in conditions in Kansas with an otherwise unremarkable temporary registration tag posted in the rear window would risk violating Sec. 8-133.  We decline to require optimal viewing conditions before compliance with a statute requiring an otherwise unremarkable license plate to be "clearly visible" is assured.

Edgerton, 438 F.3d at 1050-1051.

In the instant case, the evidence shows that condensation which likely resulted from intermittent rain was responsible for obscuring the temporary tag affixed to the rear windshield of the Monte Carlo.   Unlike the presence of tinted glass or some other obstruction, such a circumstance constitutes an "external condition" beyond Wright's ability to control.[9]  Edgerton, 438 F.3d at 1050.   Moreover, the evidence indicates that Coverdale was able to restore full visibility of the tag – and thus satisfy himself that it was in compliance with § 320.131(4) –  simply by wiping the glass with his hand.   In fact Coverdale did so, but only after he had already detained Wright and requested his driver's license.

As Coverdale had no reasonable suspicion that Wright was committing an offense once he determined that the temporary tag was not violative of § 320.131(4), he was not entitled to continue his detention of Wright or to approach Wright and ask for his driver's license.   Thus Wright's admission of having a suspended license, the subsequent discovery of cocaine and cocaine base in Wright's car, and Wright's statements to the police were the product of an unlawful detention and search and must be suppressed.

**Conclusion**

Because the court concludes that the government has failed to satisfy its burden of showing by a preponderance of the evidence that Coverdale did not violate Wright's Fourth

---

[9]  Indeed, had the tag been obscured by a material within Wright's ability to control, the court likely would have reached a different conclusion regarding his compliance with § 320.131(4)'s "clearly visible" requirement and, consequently, the propriety of his detention.   Accordingly, the court stresses that its ruling in this case is strictly limited to its specific facts.

The court nevertheless notes its concern regarding a holding that darkness, weather, or other conditions beyond the defendant's control which so obscure a temporary tag as to render it not "clearly visible" are alone sufficient to create probable cause or reasonable suspicion for a stop to determine the tag's validity.   Such a holding would be tantamount to approving virtually unrestricted authority for law enforcement to stop vehicles to inspect a temporary tag any time that "less than optimal" viewing conditions existed. See Edgerton, 438 F.3d at 1050-1051; United States v. Wilson, 205 F.3d 720 (4th Cir. 2000) (holding that Fourth Amendment does not permit a traffic stop simply to determine the validity of a temporary tag).   It is hard to imagine that this result could be consistent with the Florida legislature's intent in enacting § 320.131.   In any event, and more importantly, this result clearly does not comport with the ultimate touchstone of the Fourth Amendment, which is reasonableness. See Brigham City v. Stuart, ___ U.S. ___, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

Amendment rights on the evening of September 13, 2006, suppression of the contraband and statements gathered in connection with the seizure and search that date is warranted. Wright's motion to suppress therefore is GRANTED.

Accordingly, it is ORDERED:

Wright's Motion to Suppress Evidence and Statements (doc. 14) is GRANTED.

DONE and ORDERED this 30th day of November, 2006.


s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**


Case No. 3:06cr447/MCR